## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) </br> ) </br> ) </br> v.                                    )                 CRIMINAL NO. 09-202-P-H </br> ) </br> WILLIAM DOUGLAS,            ) </br> ) </br>         DEFENDANT       ) | |

## MEMORANDUM OF DECISION ON SENTENCING ISSUE

Congress enacted the Fair Sentencing Act of 2010 to "restore fairness to Federal cocaine sentencing."[1] Its most notable provision increases the amount of crack cocaine necessary to trigger mandatory five- and ten-year sentences. That change will reduce the current dramatic disparity in mandatory crack cocaine and powder cocaine sentences.

The issue in this case is whether the new provision that lowers the mandatory sentencing floors applies to a defendant who has not yet been sentenced, but who engaged in crack cocaine trafficking and pleaded guilty under the previous harsher regime. I conclude that it does.

### FACTS

The defendant, William Douglas, sold cocaine base—crack—to an undercover officer on four separate occasions in 2009. The total quantity was 113.1 grams. Douglas pleaded guilty on January 11, 2010. On all those dates,

---
[1] Preamble, Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010).

the statute in effect required a prison term of no less than ten years, given the quantity of crack cocaine involved.[2] Then on August 3, 2010, the President signed into law the Fair Sentencing Act of 2010. That statute raised the amount of crack cocaine necessary to trigger the ten-year mandatory minimum from 50 grams to 280 grams and the amount of crack cocaine necessary to trigger the five-year mandatory minimum from 5 grams to 28 grams.[3] Under the Fair Sentencing Act of 2010, Douglas would be subject to a mandatory minimum of five years in prison (although his Guideline range is higher than that), rather than the stiffer ten years.

Now it is time to impose sentence, and I must determine which law governs. The government says that I must apply the pre-existing and harsher mandatory ten-year minimum penalty; the defendant asks me to sentence under the new penalty provisions.

## ANALYSIS

The Fair Sentencing Act of 2010 says nothing directly about the categories of offenders to whom it applies (those who have not yet offended; offenders not yet convicted; offenders convicted but not yet sentenced; offenders already sentenced).[4] The question is how to determine Congress's will on that subject in the absence of any explicit direction. To do so, I consider the statute's text and context, the Constitution's ex post facto clause,

---

[2] Controlled Substances Act, 21 U.S.C. § 841(b)(1)(A)(2008), <u>amended by</u> Fair Sentencing Act § 2.
[3] Fair Sentencing Act § 2.
[4] For that reason, general references to "retroactivity" are not helpful. There are various possible degrees of "retroactivity" for this statute.

2

the so-called Saving Clause in Title 1 of the United States Code, the Sentencing Reform Act of 1984, and appellate decisions.

***The Fair Sentencing Act of 2010***

The public and political debate over federal crack cocaine penalties that generated this new law is well-known; I summarize it only briefly for context. Harsh crack penalties were first introduced in the Anti-Drug Abuse Act of 1986[5] upon the death of Len Bias, an All-American college basketball player, who died upon ingesting cocaine two days after the Boston Celtics drafted him.[6] The generally accepted belief then was that crack was far more addictive than powder and far more associated with violence.[7] Congress legislated mandatory minimum sentences—sentencing floors—based on a 100:1 ratio between crack and powder (five-year sentence for 5 grams of crack or 500 grams of powder; ten-year sentence for 50 grams of crack or 5,000 grams of powder). The United States Sentencing Commission then adopted that ratio throughout the guideline quantity calculations.[8]

As the years passed, the factual premises for the severe differential came into question,[9] and increasing attention was directed to significant racial

---

[5] Pub. L. No. 99-570, 100 Stat. 3207 (1986) (codified in pertinent part at 21 U.S.C. § 841).
[6] See U.S. Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy 5 (May 2002) (hereinafter 2002 Report); Louis F. Oberdorfer, Lecture: Mandatory Sentencing: One Judge's Perspective, 40 AM. CRIM. L. REV. 11, 16 (2003).
[7] 2002 Report 9.
[8] See U.S. Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy 3 (May 2007) (hereinafter 2007 Report).
[9] See, e.g., 155 Cong. Rec. S10491 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin introducing S.1789) ("[W]e have learned a great deal in the last 20 years. We now know the assumptions that led us to create this disparity were wrong.").

disparities that it produced in federal drug sentencing.[10] The Sentencing Commission published studies on the crack/powder topic, called repeatedly but unsuccessfully for reduction of the disparities, and was overruled by Congress in the Commission's own 1995 effort to reduce the Guideline disparities.[11] It issued four reports to Congress on cocaine sentencing policy.[12] Finally in 2007, it successfully reduced the crack/powder ratio under the Guidelines from 100:1 to between 25:1 and 80:1,[13] and it applied those new Guidelines retroactively to offenders already sentenced, resulting in "early" release from 2008 to 2010 of about 16,000 federal prisoners.[14] But the Commission did not lower the statutory sentencing floors (it has no authority to change statutory provisions). That history is the prelude to the enactment of the Fair Sentencing Act of 2010.

The Public Law that created the Fair Sentencing Act of 2010 is titled an act "[t]o restore fairness to Federal cocaine sentencing." Section 1 says that it "may be cited as 'the Fair Sentencing Act of 2010.'" Section 2 is ameliorative, and raises the quantities of crack necessary to trigger the five-year and ten-

---

[10] See, e.g., 2002 Report 3, 103; 2007 Report 15. It appeared that crack usage was higher among African-Americans, whereas powder usage was higher among whites and Hispanics. 2007 Report 15-16.

[11] See 2007 Report 1 ("Congress has not acted on any of the various statutory recommendations set forth in the Commission's prior reports and expressly disapproved the Commission's guideline amendment addressing crack cocaine penalties submitted on May 1, 1995.").

[12] 2007 Report; 2002 Report; U.S. Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy (Apr. 1997); U.S. Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy (Feb. 1995).

[13] See Kimbrough v. United States, 552 U.S. 85, 106 (2007); Amendments to the Sentencing Guidelines for United States Courts, 72 Fed. Reg. 28,571-28,572 (May 21, 2007).

[14] U.S. Sentencing Commission, Preliminary Crack Cocaine Retroactivity Data Report (Sept. 2010), available at http://www.ussc.gov/USSC_Crack_Retroactivity_Report_2010_October.pdf (last visited Oct. 25, 2010).

year sentencing floors that I have already recounted (5 grams becomes 28 grams and 50 grams becomes 280 grams). Section 3 is ameliorative and eliminates the mandatory minimum sentence for simple possession of crack. Section 4 increases fine penalties. Section 5 directs the Sentencing Commission to review and amend the Guidelines to provide a two-level Guideline increase if a defendant used, threatened or directed use of violence. Section 6 directs the Commission to provide a two-level increase for a variety of circumstances including bribery and "super-aggravating factors." Section 7 is ameliorative and directs the Commission to cap the Guideline base offense at 32 for a defendant who receives a minimal role adjustment and to subtract 2 additional levels for certain other ameliorating circumstances. Section 8 gives the Commission emergency authority and instructs it to promulgate all necessary Guidelines, amendments and policy statements within 90 days of enactment, *i.e.*, by November 1, 2010. Section 9 requires the Commission to report to Congress within one year concerning the effectiveness of drug court programs. Section 10 requires a five-year report from the Commission on the impact of changes made by the Fair Sentencing Act and the attendant Guideline amendments.

Thus, the new law contains significant ameliorating provisions, modest penalty increases and some urgency. It has already caused the Commission to issue amended, emergency guidelines, including amendments that reduce the base offense levels for various quantities of crack cocaine, all effective

November 1, 2010.[15] The quantity amendments are based explicitly upon the Fair Sentencing Act's new mandatory minimum sentences.[16] They will apply to all offenders sentenced after November 1, 2010, even if those offenders committed their offenses before August 3, 2010.[17]

Not surprisingly, the Fair Sentencing Act emerged out of compromise. The bill that Senator Durbin introduced in the Senate would have created a 1:1 ratio, but the outcome was 18:1.[18] The Act significantly lowers crack sentences, but it also increases penalties for certain conduct. Another subject of debate was whether the new penalties should apply retroactively to those already sentenced and in prison, as the Commission's 2007 amendments had

---

[15] Temporary Emergency Amendment to Sentencing Guidelines and Commentary, 75 Fed. Reg. 66,188 (Oct. 27, 2010).

[16] According to the Commission:
> To account for these statutory changes, the amendment conforms the guideline penalty structure for crack cocaine offenses to the approach followed for other drugs, i.e., the base offense levels for crack cocaine are set in the Drug Quantity Table so that the statutory minimum penalties correspond to levels 26 and 32. See generally §2D1.1, comment. (backg'd.). Accordingly, using the new drug quantities established by the Act, offenses involving 28 grams or more of crack cocaine are assigned a base offense level of 26, offenses involving 280 grams or more of crack cocaine are assigned a base offense level of 32, and other offense levels are established by extrapolating upward and downward. Conforming to this approach ensures that the relationship between the statutory penalties for crack cocaine offenses and the statutory penalties for offenses involving other drugs is consistently and proportionally reflected throughout the Drug Quantity Table.

Id. at 66191.

[17] The emergency amendments expire on November 1, 2011. For permanent amendments, the Commission must go through the official 2011 promulgation cycle, by which it proposes Guideline amendments by May 1, 2011 and gives Congress an opportunity to reject them before they go into effect on November 1, 2011. 28 U.S.C. § 994(p); U.S. Sentencing Commission, Rules of Practice and Procedure 4.1, 62 Fed. Reg. 38,598, 38,599 (July 18, 1997); U.S. Sentencing Commission, News Release: United States Sentencing Commission Promulgates Amendment to Implement Fair Sentencing Act of 2010 (Oct. 15, 2010), available at http://www.ussc.gov/PRESS/rel20101015.pdf (last visited Oct. 25, 2010).

[18] See S. 1789, 111th Cong. (2009) (as introduced, Oct. 15, 2009).

done.[19] The decision was no.[20] But the statute itself contains no provision stating in so many words either that it applies to all sentencings going forward, or that it applies only to criminal conduct that occurs after its effective date.[21]

*Ex Post Facto Clause*

The Constitution's ex post facto clause, Art. 1, § 9, cl. 3, "forbids the application of any law or rule that *increases* punishment to preexisting criminal conduct."[22] Thus, the new enhancements in the Fair Sentencing Act of 2010 cannot be applied if they result in a harsher penalty for someone who had already committed the crime.[23] But the ex post facto clause does not prohibit retroactive change that lightens penalties, as does the changed

---

[19] When the Commission introduced its ameliorating Guideline amendments in 2007, their retroactivity to the current prison population was a subject of much debate. Subcommittee hearings of the House Judiciary Committee reveal concern from some law enforcement representatives and some members of Congress about early release of prisoners already sentenced. Cracked Justice – Addressing the Unfairness in Cocaine Sentencing: Hearings Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 110th Cong. 4, 46-47, 164-65 (Feb. 26, 2008).

[20] See United States v. Bell, No. 09-3908, 2010 WL 4103700, at *10 (7th Cir. Oct. 20, 2010) (Fair Sentencing Act is not retroactive); United States v. Brown, No. 10-1791, 2010 WL 3958760, at *1 (8th Cir. 2010) (same); United States v. Carradine, No. 08-3220, 2010 WL 3619799, at *5 (6th Cir. Sept. 20, 2010) (Fair Sentencing Act "contains no express statement that it is retroactive nor can we infer any such express intent from its plain language").

[21] One of the bills under consideration would have applied its new penalties only to criminal conduct committed 180 days after enactment. Drug Sentencing Reform & Cocaine Kingpin Trafficking Act of 2009, H.R. 265, 111th Cong. § 11 (2009). The other bills were silent on the topic. See Fairness in Cocaine Sentencing Act of 2009, H.R. 1459, 111th Cong. (2009); Major Drug Trafficking Prosecution Act of 2009, H.R. 1466, 111th Cong. (2009); Crack-Cocaine Equitable Sentencing Act of 2009, H.R. 2178, 111th Cong. (2009); Powder-Crack Cocaine Penalty Equalization Act of 2009, H.R. 18, 111th Cong. (2009).

[22] United States v. Havener, 905 F. 2d 3, 5 (1st Cir. 1990).

[23] The commentary to USSG § 1B1.11 provides:
> Although aware of possible ex post facto clause challenges to application of the guidelines in effect at the time of sentencing, Congress did not believe that the ex post facto clause would apply to amended sentencing guidelines. S. Rep. No. 225, 98th Cong., 1st Sess. 77-78 (1983). While the Commission concurs in the policy expressed by Congress, courts to date generally have held that the ex post facto clause does apply to sentencing guideline amendments that subject the defendant to increased punishment.

7

crack/powder ratio. And there is no legal impediment if sentencing amendments, taken as a whole, result in no harsher punishment to a particular defendant.[24]

Thus, the ex post facto clause does not suggest any likely congressional intent one way or the other.

*Saving Clause,[25] Sentencing Reform Act of 1984, and Case Law*

In 1871, Congress enacted its first general savings provision, c. 71, 16 Stat. 432. The purpose of the savings provision was "to abolish the common-law presumption that the repeal of a criminal statute resulted in the abatement of 'all prosecutions which had not reached final disposition in the highest court authorized to review them.'"[26] Under previous cases, the substitution of a new statute with different penalties would result in the termination of all pending

---

[24] United States v. Anderson, 61 F.3d 1290, 1302 (7th Cir. 1995) ("there is no ex post facto problem when the Guideline Manual in effect at sentencing, taken as a whole, cannot possibly generate a sentence more severe than the most lenient sentence that was available at the time the defendant committed his offense") (citing United States v. Nelson, 36 F.3d 1001, 1004 (10th Cir. 1994)); United States v. Springer, 28 F.3d 236, 237-38 (1st Cir. 1994) (applying the "one book" rule to reject argument that the district court should have given the defendant the benefit of provisions in different editions of the Guideline Manual).

[25] That is what Warden v. Marrero, 417 U.S. 653, 659 (1974) calls it, and I follow that terminology. The First Circuit has called it the "general saving statute." United States v. Rumney, 979 F.2d 265, 267 (1st Cir. 1992).

[26] Warden v. Marrero, 417 U.S. 653, 660 (1974) (quoting Bradley v. United States, 410 U.S. 605, 607 (1973)). Bradley characterized the common law rule as follows:
> At common law, the repeal of a criminal statute abated all prosecutions which had not reached final disposition in the highest court authorized to review them. . . Abatement by repeal included a statute's repeal and re-enactment with different penalties. . . And the rule applied even when the penalty was reduced.

410 U.S. at 607-08. That, said the Court, was the reason for the creation of the Saving Clause. Id. at 608. (The issue in Bradley was whether a saving clause that referred to "prosecutions" included "sentencing" as part of the prosecution. Id.)

prosecutions, even when the statute merely reduced the applicable sentence.[27]

In 1947, Congress codified the statute at 1 U.S.C. § 109 (the "Saving Clause"). Now it provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

The Saving Clause has led four circuit courts and several district courts to refuse to apply the more lenient mandatory minimum sentences of the Fair Sentencing Act to criminal conduct that occurred before August 3, 2010, the effective date of the Act.[28] Unlike this case, however, all those defendants had already been sentenced before August 3, 2010.

The government says that the Saving Clause nevertheless applies here as well, and to all future prosecutions and sentencings based on pre-August 3, 2010, conduct.[29] It says that the Fair Sentencing Act does not "expressly

---

[27] See United States v. Tynen, 11 Wall. 88, 91 (1871); Commonwealth v. Kimball, 38 Mass. 373, 376-77 (1838).

[28] United States v. Bell, No. 09-3908, 2010 WL 4103700, at *10 (7th Cir. Oct. 20, 2010) (challenging on direct review sentence imposed prior to the enactment of the Fair Sentencing Act); United States v. Brown, No. 10-1791, 2010 WL 3958760, at *1 (8th Cir. Oct. 12, 2010) (same); United States v. Gomes, No. 10-11225, 2010 WL 3810872, at *2 (11th Cir. Oct. 1, 2010) (same); United States v. Carradine, No. 08-3220, 2010 WL 3619799, at *12-13 (6th Cir. Sept. 20, 2010) (same); United States v. Millhouse, No. 7:04-CR-85-F3, 2010 U.S. Dist. LEXIS 112988, at *6 (E.D.N.C. Oct. 22, 2010) (denying motion to reduce sentence); United States v. Jones, No. 08-40, 2010 U.S. Dist. LEXIS 110423, at *3 (W.D. Pa. Oct. 18, 2010) (same); United States v. Hughes, No. 07-33, 2010 WL 3982138, at *3 (W.D. Wis. Oct. 8, 2010) (same); United States v. United States v. Ohaegbu, No. 92-35, 2010 WL 3490261, at *1-2, (M.D. Fla. Aug. 31, 2010) (same).

[29] At oral argument, I did inquire of the Assistant United States Attorney whether his argument was a matter of individual U.S. Attorney Office discretion or the position of the Department of Justice, and he replied that he understood it to be the policy of the Department of Justice.

provide" that the previous harsher penalties are extinguished or released, and consequently that omission is the end of the statutory construction exercise. The defendant, on the other hand, advances four arguments for not applying the Saving Clause here. First, he says, the Fair Sentencing Act of 2010 does not release or extinguish a penalty, the concern of the Saving Clause. Instead, it "merely modified the extent to which the amount of drugs involved in the offense cabins the court's sentencing discretion."[30] In other words, a sentencing judge still has authority to impose the harsher sentence that the old law provided as a floor. Second, he argues, the Saving Clause does not apply to remedial or procedural changes, the type of changes that he says the Fair Sentencing Act makes.[31] Third, the Saving Clause does not apply if it frustrates later congressional intent reflected "by express declaration or necessary implication" in the new statute.[32] Here, applying the Saving Clause to make federal judges continue applying the old mandatory minimums, he maintains, would frustrate the congressional goal of remedying their racially discriminatory impact.[33] Fourth, he asserts that applying the Saving Clause here to preserve the old mandatory minimums would raise serious Fifth Amendment and Eighth Amendment issues that should be avoided.[34]

---

[30] Def.'s Sentencing Mem. at 5 (Docket Item 49).
[31] The defendant also points out that there is no abatement of prosecution at stake here, the concern of the Saving Clause. Douglas's conviction stands; the only issue is the applicable penalty structure. Id. at 8.
[32] Id. at 9 (citing Great N. Ry. Co. v. United States, 208 U.S. 452, 465 (1908)).
[33] Id. at 10.
[34] Id. at 12.

The defendant's first two arguments are clearly foreclosed by Supreme Court interpretation of the Saving Clause. In Warden v. Marrero,[35] the issue was whether a new statute repealing an earlier statutory prohibition on parole could benefit a defendant who had already been sentenced and imprisoned under the old no-parole system.[36] In Marrero, the Court applied the Saving Clause to enforce the earlier parole prohibition even though the new statute still allowed the sentencing judge and the Board of Parole discretion to prohibit parole in individual cases.[37] Here, analogously (and contrary to the defendant's argument), the Fair Sentencing Act extinguishes the mandatory minimum of ten years for a defendant with Douglas's quantity of crack, even

---

[35] 417 U.S. 653, 659 (1974).

[36] The Third Circuit Court of Appeals said yes, reasoning that despite the Saving Clause, the defendant's "conviction and sentence would remain intact even if he were released on parole." Marrero, 417 U.S. at 660 n.11. But the Supreme Court said no, that the new statute had "repealed" the previous prohibition on parole, and that the effect of the Saving Clause was to preserve the earlier harsher punishment structure because "if the repeal . . . can be viewed as mitigating respondent's punishment . . ., his conviction and sentence would not be left intact by the repealer and his prosecution would 'technically' abate under the common-law rule." Id. The Supreme Court stated broadly in Marrero that the Saving Clause works to "bar application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of an offense." Id. at 661. Also, in Bradley v. United States, 410 U.S. 605, 609-10 (1973), the Supreme Court considered whether a sentencing judge could apply more lenient sentencing provisions that became effective after the date of the offense but before sentencing. The Supreme Court ruled that specific saving language in the new statute required the sentencing judge to impose the harsher punishment in force at the time of the offense. Id.

[37] There is one important difference between Marrero and this case. In Marrero, 417 U.S. at 655, the defendant had already been sentenced and was serving his sentence before the new law was enacted. Under the law in effect when he was sentenced, the sentencing judge determined the sentence on the understanding that the defendant would be ineligible for parole. The new statute, which Marrero wanted applied to him, would allow parole. Arguably, if the sentencing judge had known parole was available, he or she would have chosen a longer sentence. The Supreme Court used such reasoning in explaining why the statute's own saving clause kept the prohibition on parole intact. 417 U.S. at 658. Here, in contrast, no sentence has been imposed, and I as the sentencing judge can take full account of the new law in crafting the sentence. But the broad Marrero language (the Saving Clause works to "bar application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of an offense", id. at 661) is too strong to permit a trial court judge to distinguish it on that basis.

though a sentencing judge could still impose a ten-year penalty. And although Marrero did recognize a distinction between substance, on the one hand, and procedure or remedy, on the other (stating that "the general saving clause does not ordinarily preserve discarded remedies or procedures"), the Marrero Court distinguished "punishment" (actually mentioning mandatory minimum sentences) from procedure and remedy, finding that punishment was subject to the Saving Clause.[38]

Contrary to the defendant's fourth argument, I see no serious Fifth or Eighth Amendment concern that would cabin Congress's authority to make its new reform apply only to criminal conduct occurring after the statute's enactment, and I do not further address that argument.[39]

There is force to part of the defendant's third argument, however—that provisions of the Fair Sentencing Act, either by express declaration or

---

[38] Marrero, 417 U.S. at 660-661. See also United States v. Havener, 905 F.2d 3, 9 (1st Cir. 1990), treating punishment as "more substantive than procedural." There is broad language about the Saving Clause in some First Circuit decisions, but the cases are distinguishable. In Havener, for example, the First Circuit ruled that the Saving Clause "provides that new statutes that *decrease* punishment normally do not affect pending prosecutions." 905 F.2d at 6. But the issue in Havener was the application of a Guideline change to a defendant who had already been sentenced under a previous Guideline, and the court was speaking only "as a general matter" about the effects of the Constitution's ex post facto clause and the Saving Clause on statutory amendment. Id. at 5. In United States v. Rumney, 979 F.2d 265, 267 (1st Cir. 1992), the defendant had been through sentencing and appeal, and on a later collateral attack, the issue was whether the entire prosecution should be undone by a later re-definition of who was a felon for purposes of the criminal prohibition of felons possessing weapons. The court said no.

[39] Douglas has not cited any cases expressing concern that sentencing a defendant under a statute that has since been amended raises serious Fifth or Eighth Amendment questions. Furthermore, the First Circuit has repeatedly upheld the pre-Fair Sentencing Act law against Fifth and Eighth Amendment challenges. United States v. Singleterry, 29 F. 3d 733, 741 (1st Cir. 1994) (upholding sentence for crack offenses against Fifth Amendment equal protection challenge); United States v. Garcia-Carrasquillo, 483 F.3d 124, 135 (1st Cir. 2007) (upholding 210-month sentence for the distribution of less than 100 grams of crack cocaine against an Eighth Amendment challenge); United States v. Graciani, 61 F.3d 70, 76(1st Cir. 1995) ("with a regularity bordering on the echolalic, courts have repulsed Eighth Amendment challenges to lengthy incarcerative sentences in drug cases").

necessary implication, prevent applying the 1871 Saving Clause to preserve the harsher statutory minimums for sentences imposed in the future.

In Marrero, the new statute had its own saving clause that *specifically preserved* the harsher penalty for prosecutions occurring prior to the effective date of the statute.[40] Thus, Marrero was not a case where the new statute expressly or by necessary implication released or extinguished the previous harsher penalty. In that respect, one element in the Fair Sentencing Act and its relationship to pre-existing law deserve closer attention. It is an element that the lawyers did not address in their written briefs (I did raise it with them at oral argument on October 20, 2010), and the cases refusing to apply the Fair Sentencing Act's new penalties have not mentioned it. It is this: Unlike the statute in Marrero, there is no saving clause in the Fair Sentencing Act itself. To the contrary, in this statute Congress expressly granted the Commission *emergency* Guideline amendment authority,[41] so that the Commission could adopt Guideline amendments effective almost immediately.[42] And in addition, Congress expressly directed the Commission to adopt Guideline amendments "as soon as practicable, and in any event not later than 90 days", *i.e.*, by

---

[40] 417 U.S. at 656 n.4.
[41] Fair Sentencing Act § 8. The Commission sought emergency amendment authority in its 2007 Report, because it "would enable the Commission to minimize the lag between any statutory and guideline modifications for cocaine offenders." 2007 Report 9.
[42] The emergency amendments are effective November 1, 2010, but they will expire on November 1, 2011, unless the Commission adopts them in a regular cycle. 28 U.S.C. § 994(p); U.S. Sentencing Commission, Rules of Practice and Procedure 4.1, 62 Fed. Reg. 38598; U.S. Sentencing Commission, News Release: United States Sentencing Commission Promulgates Amendment to Implement Fair Sentencing Act of 2010 (Oct. 15, 2010), available at http://www.ussc.gov/PRESS/rel20101015.pdf (last visited Oct. 25, 2010).

13

November 1, 2010.[43] What amendments? To be sure, the new enhancement provisions, but also any changes in the new crack penalty provisions. Where would the latter changes come from? From the new statutory minimum provisions. According to the statutory language, Congress instructed the Commission "pursuant to the emergency authority provided under paragraph (1), [to] make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law."[44] The Commission has followed Congress's instructions. Effective November 1, 2010, "the relationship between the statutory penalties for crack cocaine offenses and the statutory penalties for offenses involving other drugs is consistently and proportionally reflected throughout the Drug Quantity Table."[45] But the new Guidelines cannot be "conforming" and "achieve consistency" (Congress's express mandate) if they are based upon statutory minimums that cannot be effective to a host of sentences over the next five years until the statute of limitations runs on pre-August 3, 2010 conduct.

What is more, for years the Sentencing Reform Act of 1984 has directed expressly that the governing Guidelines are those in effect on the day a defendant is sentenced.[46] The Guideline commentary refers to this statutory provision as "Congress's *directive* to apply the sentencing guidelines in effect at

---

[43] Fair Sentencing Act § 8.
[44] Fair Sentencing Act § 8(2).
[45] Temporary Emergency Amendment to Sentencing Guidelines and Commentary, 75 Fed. Reg. 66,188, 66,191 (Oct. 27, 2010).
[46] 18 U.S.C. § 3553(a)(4)(A)(ii).

14

the time of sentencing."[47] Thus, during the past two decades of the Guidelines' existence, whenever the Commission has adopted Guideline amendments, those amendments have applied to all defendants sentenced thereafter, regardless of when the crime was committed.[48] That is what will happen to the new Guidelines' alterations of the base offense levels for various quantities of crack: the new Guidelines will apply to all future sentencings after November 1, 2010, even if the criminal conduct occurred before the Fair Sentencing Act's effective date. Congress "expressly" required that outcome by ordering the emergency amendments within 90 days.[49] Thus, many pre-August 3, 2010 offenders will benefit from the changed crack offense levels, at least if the mandatory minimums do not apply to them.[50] Congress instructed the Commission to make such changes and make them immediately, under an existing statutory structure that makes them apply to those who have already offended but who have not yet been sentenced. It would be a strange definition of "conforming" and "consistency" to have these new amended Guidelines go

---

[47] USSG § 1B1.11 Background Note (emphasis added).

[48] 18 U.S.C. § 3553(a)(4)(A)(ii) (except in cases of remand, courts should apply guidelines "in effect on the date the defendant is sentenced"); USSG § 1B1.11(a); United States v. De La Rosa-Ramos, 365 Fed. Appx. 226, 229 (1st Cir. 2010) ("Unless doing so would cause an ex post facto problem, a sentencing court should use the version of the guidelines in effect on the date of sentencing."); United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990) ("barring any ex post facto problem, defendant is to be punished according to the guidelines in effect at the time of sentencing").

[49] Fair Sentencing Act § 8.

[50] Some may escape the mandatory minimums by qualifying for the safety valve; some will benefit from the new ratios because their sentences are and will remain above the statutory minimums anyway. Indeed, if the defendant Douglas were not to receive a 3-level decrease for acceptance of responsibility under U.S.S.G. 3E1.1, his Base Offense level and Criminal History would place his Guideline range well above the ten-year mandatory minimum, and thus the Guideline reduction in crack offense levels would benefit him if he were to be sentenced after November 1, 2010 even though his offense conduct occurred before August 3, 2010. But given his acceptance of responsibility, the new offense level that the Commission has adopted for crack yields a Guideline sentence that is, for Douglas, below the 10-year minimum.

15

into effect while the old and therefore inconsistent statutory minimums continue.

Finally, Congress stated that its goal was to "restore fairness to Federal cocaine sentencing."[51] Understandably, Congress might not have wanted a large volume of previously sentenced offenders to be released from prison immediately. But what possible reason could there be to want judges to *continue* to impose new sentences that are not "fair" over the next five years while the statute of limitations runs?[52] Unlike Marrero, the explicit congressional grant of emergency guideline amendment authority and the mandate of "consistency" and "conforming" amendments, coupled with the express language of the Sentencing Reform Act of 1984 (that the Guidelines in effect on the day of sentencing control irrespective of when offense conduct occurred), unmistakably demonstrate Congress's urgency and expectation of immediate change.

The Supreme Court explained in 1908 that the 1871 Saving Clause "cannot justify a disregard of the will of Congress as manifested either expressly *or by necessary implication* in a subsequent enactment."[53] I observe

---

[51] Preamble, Fair Sentencing Act.
[52] See 18 U.S.C. § 3282(a) ("no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed").
[53] Great N. Ry. Co. v. United States, 208 U.S. 452, 465 (1908) (emphasis added). The Supreme Court further explained this principle as follows:
> [T]he provisions of [the savings statute] are to be treated as if incorporated in and as a part of subsequent enactments, and therefore under the general principles of construction requiring, if possible, that effect be given to all the parts of a law the section must be enforced *unless either by express declaration or necessary implication arising from the terms of the law,* as a whole

*(continued next page)*

that in 1974 Marrero did not overrule this statement. In fact, Marrero specifically described the Great Northern principle as applying to later congressional will manifested by "*fair* implication or expressly."[54] If Congress's action here concerning when the restoration of fairer sentencing is to occur does not satisfy the adverb "expressly," interpreting the Fair Sentencing Act to apply to all new sentences is certainly a "fair implication," and a "necessary implication" of what Congress has done. Indeed, it is difficult to see anything as demonstrating a contrary implication.

In fairness to the government, I recognize some merit in its contrary argument. The government does not argue that Congress actually *intended* a delay in the effectiveness of the statutory minimum changes. Instead, the government relies solely on what it believes to be neutral rules of construction: that because of the Saving Clause, unless the 2010 Act *expressly* repealed the old statutory minimums, the harsher penalties must continue.[55] Here, the government argues, Congress did not use sufficiently explicit language. Sometimes invocation of blunt rules that apply without subtlety is useful (every

---

> it results that the legislative mind will be set at naught by giving the effect to the provisions of [the savings statute].

Great N. Ry. Co., 208 U.S. at 465.

[54] Warden v. Marrero, 417 U.S. 653, 659 n.10 (1974)(emphasis added).

[55] Gov't's Sentencing Mem. at 3 (Docket Item 52). That is the best way to state the argument. It is not persuasive to argue that Congress must be aware of its extant Saving Clause and that therefore the failure to mention retroactivity expressly in the Fair Sentencing Act is a conscious decision to avoid application to past offenses. It is at least as likely that Congress is not aware of how the Saving Clause works, that its focus was on the dramatic racial disparities in sentencing that it wanted to correct and that if it considered retroactivity at all, its only concern was the release from prison of thousands of offenders sentenced under the old regime. Moreover, Congress knows how to include express language that an old law should continue to apply; it did so in the Comprehensive Drug Abuse Prevention and Control Act of 1970, the statute at issue in Marrero.

17

trial judge knows that). But not here, where the question is what the democratically elected Representatives and Senators have accomplished. I do not rely upon 1871 to escape the ramifications of what Congress set out to do in 2010. Instead, I read the statutes of 1871, 1984 and 2010 together, and determine that in 2010 Congress changed the course of all federal crack sentencings thereafter.[56]

I conclude, based upon the context of the Act, its title, its preamble, the emergency authority afforded to the Commission, and the Sentencing Reform Act of 1984, that Congress did not want federal judges to continue to impose harsher mandatory sentences after enactment merely because the criminal conduct occurred before enactment. Yes, the 1871 Saving Clause deserves attention, but it does not command *special* attention. Generally, as Great Northern recognized, an earlier Congress cannot bind a later Congress. If it is a stretch to say that the Fair Sentencing Act of 2010 "expressly provide[s]" that the previous mandatory minimums are vacated for future sentences, Congress certainly made clear the urgency of change and its concern for fairness; and it gave no signal that it was distinguishing the emergency Guideline amendments that it expressly mandated from the statutory sentencing floors from which they directly flow. In the words of the Supreme Court, it is either a "necessary

---

[56] I believe that my analysis is consistent with the First Circuit's treatment of a different saving clause in a case not cited by the parties, Passamaquoddy Tribe v. Maine, 75 F.3d 784, 788-89 (1st Cir. 1996)(citations omitted): "The chief objective of statutory interpretation is to give effect to the legislative will. To achieve this objective a court must take into account the tacit assumptions that underlie a legislative enactment, including not only general policies but also preexisting statutory provisions. Put simply, courts must recognize that Congress does not legislate in a vacuum."

18

implication" or a "fair implication" that, although retroactivity to those previously imprisoned might not be contemplated, the Fair Sentencing Act of 2010 permits no further federal crack sentencings that are not "fair."[57]

## CONCLUSION

My holding is this: a defendant not yet sentenced on November 1, 2010, is to be sentenced under the amended Guidelines, and the Fair Sentencing Act's altered mandatory minimums apply to such a defendant as well.

The Clerk's Office shall schedule this matter for sentencing accordingly.

**SO ORDERED.**

**DATED THIS 27TH DAY OF OCTOBER, 2010**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[57] Indeed, I would find it gravely disquieting to apply hereafter a sentencing penalty that Congress has declared to be unfair. One can imagine the ramifications of a contrary decision. Defendants would seek to negotiate with federal prosecutors to waive indictment and plead to an information that charges conduct that extends *after* August 3, 2010, so that they could be sentenced under the new Act. That charging option would be formidable leverage for prosecutors until the statute of limitations has run on criminal conduct that occurred before August 3, 2010. And that discretion would be lodged with prosecutors where its exercise is invisible, rather than with judges whose decisions must be explained upon the public record. That operation of the Fair Sentencing Act would belie its title, at least for the next few years.